IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:16- CR-166-FL

| UNITED STATES OF AMERICA, | ) |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) | ORDER |
|  | ) |  |
| DWIGHT CHRISTOPHER BROWN, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

This matter is before the court on defendant's motion for new trial, made pursuant to Federal Rule of Criminal Procedure 33. (DE 74). Upon completed briefing, the court convened hearing on the motion May 1, 2017. The issues raised are ripe for ruling. For the reasons that follow, defendant's motion is denied.

## BACKGROUND

On July 12, 2016, a grand jury returned an indictment charging defendant with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and § 924.[1] Defendant pleaded not guilty to count one and trial commenced on February 14, 2017.[2] At around 3:00 p.m. on February 16, 2017, the court discharged the jury to begin its deliberations. At approximately 3:40 p.m. the jury sent a note through its foreperson to the court which read "[p]lease

---

[1] On December 13, 2016, a grand jury returned a superseding indictment. The superseding indictment is identical to the initial indictment, except that superseding indictment indicates that the offense conduct occurred on March 3, 2016, rather than March 4, 2016. (See DE 1, 28).

[2] Defendant waived his right to an initial appearance on the superseding indictment. (DE 31).

define reasonable doubt." (DE 63). The note also stated "[w]e would like to hold the gun, the ammo, the magazine. Could someone bring those to the jury room." (Id.). The court addressed the jury's note with the parties, first by acknowledging that courts are not obligated to define reasonable doubt. Defendant requested a definition, offering as an example the definition provided in United States v. Williams, 152 F.3d 294 (4th Cir. 1998). The government acquiesced to defendant's definition, requesting only that the definition include that reasonable doubt is not based on sympathy and common sense. After further discussion with the parties, the court summoned the jury back in the courtroom and provided the following instruction:

> Reasonable doubt is a real doubt based upon reason and common sense and careful and impartial consideration of all the evidence in the case. Now, you'll recall, during jury selection, I told you, among other things, it is very important for you to know and understand that your sole source of information must come from evidence presented to you in this courtroom. And you cannot supply the answer to unanswered questions arising in your mind by guessing. The answer must be found within the confines of the evidence presented in court. And among other instructions in my final instructions, you will recall that I instructed you in performing this duty of deciding whether or not the government has proven the defendant's guilt beyond a reasonable doubt, you must not be persuaded by bias, prejudice, or sympathy as to any party or by any public opinion. And I'll remind you, as I told you earlier, you're to be guided by all of the [c]ourt's instructions, those given to you at the beginning, in the middle of the trial, and in the end. Don't single out any one, consider them as a whole.

(Tr. Day 3, DE 81 at 523:11–524:5). The court complied with the jury's second request by assigning the courtroom clerk to bring the sought after items to the jury room for inspection.

The day wound down with no verdict forthcoming. The court admonished the jury at the close of business February 16, 2017, together with the alternate who remained on premises, to remember the court's instructions including those governing conduct during any separation. The jury then was discharged in the presence of the parties.

Court reconvened at approximately 9:00 a.m. on February 17, 2017. Before the jury was

2

returned to the courtroom, the court informed the parties it had learned that when the clerk was securing the jury room the evening before, the jury foreperson and one other juror remaining in the room approached her and asked if it would be possible to substitute a juror. The court informed the parties of its intent simply to call the jury into the courtroom, remind them of their duties, and have them return to the jury room to continue deliberations. The government suggested the court investigate further whether a juror was intentionally disregarding his or her duties:

> So if that's the issue, that there's someone in this jury pool that's not willing to apply the facts to the law, then I think that's something we should be aware of. If it's, you know, illness or something else, you know, if there are other things that the Court can properly address with the whole group – but I think if that's – I mean, that's what this whole case is about, applying the facts to the law. And if that is the concern, I think we should be aware of it.

(Tr. Day 4, DE 73, 3: 15-23). The court declined to entertain suggested inquiry underlying the government's concern that one juror might need to be removed and the alternate substituted, responding in part:

> I don't think we're there yet though. I think we're not anywhere close to that yet. So what I would just like to do is hope that after a good night's sleep and they come back here today, they listen to what I have to say and they go back in and they listen to each other and go through the facts and the evidence. Now if we get a note that gives us some details, then it becomes something I think would maybe need some more pointed address. But you're going to have to give me authority for taking a juror off, out of a jury who simply refuses to consider the others.

\* \* \*

> Now, I think if there's a mental issue, if someone is unable to participate because they're always in the bathroom, I mean, that's a whole different ball of wax. But you ought to, in this break, be researching what my authority would be to go in and inquire along those lines and take those steps that you, I think, are thinking about.

(Id. at 3: 24-25; 4: 1-12; 4: 17-24)

3

Defendant then offered through counsel "you can bet that we would strongly object to just striking someone just because they didn't agree with the rest of the group," clarified by statement "I mean, the Court knows that we're going to take a very strong position on that." (Id. at 5: 3-7).

After alerting the parties to this report, and hearing their concerns, having declined the government's request to learn directly from the foreperson the basis of her concerns while indicating it could revisit the issue if a note was provided to it offering some details, the court summoned the jury into the courtroom, reminded them of their duties and the court's previous instructions, and discharged the jury to the jury room to continue their deliberations at or around 9:11 a.m. Shortly thereafter, around 10:20 a.m., the jury submitted a note which read: "We have reached an impasse. We have at least 1 person on each side (guilty/not guilty) that is/are adamant about not changing their minds. We need direction on how to proceed." (DE 64). Defendant requested the court give the Allen charge[3], a copy of which the court previously had provided the parties with, in anticipation of this issue.

While not objecting to the form of the court's Allen charge, the government articulated concern that somehow the clerk's measured response to the foreperson in the jury room the evening before had led the foreperson to believe she could not bring to the court's attention that a juror was refusing to deliberate, meriting at this time pointed inquiry by the court. Both sides referred in dialogue with the court to the foreperson's deliberate vagueness. The government offered through counsel "I agree [with defense counsel] that this letter is deliberately vague." (Id. at 10: 8-9). Counsel continued:

---

[3] An Allen charge, based on the Supreme Court's decision in Allen v. United States, 164 U.S. 492 (1866), is "a supplemental instruction given by a trial court when the jury has reached an impasse in its deliberations and is unable to reach a consensus." United States v. Cornell, 780 F.3d 616, 625 (4th Cir. 2015).

4

> So it's not clear if there's one juror that's holding out and the other 11 are one way or – I think that they left this deliberately vague. I think our only concern is that when the foreperson yesterday asked the clerk to remove a juror, she did so for a reason. And if the clerk told her, you know, this is not the appropriate way to do this..."

(Id. at 10: 13-16). The court reminded counsel that when asked if it would be possible to substitute a juror the clerk had informed the court that she responded simply that she could not address this question.[4] Government counsel persisted, "[b]ut that, Your Honor, that may have possibly left it to the foreperson to believe that this was not something that could be addressed." (Id. at 10: 19-21).

The court responded in part "I'm not aware of any case law that permits a judge to pull a juror who has a heartfelt, steadfast view developed, albeit, very, very quickly [but] [n]ow, if you want me to pull the foreperson in here and just ask her about what happened yesterday just so I can understand fully, I will do that." (Id. at 11:1-7). The government was satisfied. Defendant, however, through counsel offered a passionate response, in mistaken understanding that the court intended to expansively question the foreperson:

> That's over our vehement objection. Your Honor. I think that this is invading the province of the jury. The jury is a sacred part of the criminal justice system. And for us to pierce that veil and invade that space I think is completely inappropriate. If that foreperson had gone to [the clerk] yesterday for example, and said we have someone who is refusing to deliberate, who is refusing to read the jury instructions, who is saying that she has a moral opposition to finding someone guilty, that would be something else. But I don't think that we have any place – we couldn't find any case that allowed the judge to do what [counsel for the government] is asking you to do.

(Id. at 11: 10-22). The court reminded counsel the line of inquiry would be limited to the nature of the foreperson's contact with a member of court staff the evening before.

The foreperson was brought into the courtroom and in front of the parties she responded

---

[4] The particular clerk at issue was not working in the courtroom on day 4 of the trial.

5

affirmatively that she was aware she could raise her concerns directly with the court but had not done so because she wanted to give the jury additional time for reflection and to deliberate more this morning. The court acknowledged receipt of the note, thanked the foreperson for writing, and instructed her to return to the jury room and let her fellow jurors know that the court would be requesting their presence in the courtroom to give them direction. Both sides appeared satisfied. The court indicated it would now give the Allen charge. The jurors returned and the court addressed them:

> Of course this case is important. It's been expensive for both sides, for the prosecution and for the defense. If you should fail to reach a verdict or agree on a verdict, the case is left open and undecided. And, like all cases, it must be disposed of at some time. There appears no reason to believe that any other trial would be any less expensive for both sides or the could be tried any better than it has been in this instance. And, further, any other jury must be selected in the same manner, from the same source as you have been chosen. So there appears no reason to believe the case will ever be submitted to 12 men and women more intelligent, more impartial, or more competent to decide it, or that more or clearer evidence would be produced on behalf of either side. It's unnecessary to add that the [c]ourt does not wish any juror to surrender his or her conscientious convictions. As stated in the instructions given at the time the case was submitted to you, do not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinion of the other jurors or for the mere purpose of returning a verdict. However, it is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can without doing violence to your individual judgment. Each of you must decide the case for himself and for herself. But you should do so only after consideration of the evidence with your fellow jurors. In the course of your deliberations, don't hesitate to change your mind when convinced it is erroneous. Each juror who finds himself or herself in the minority should give equal consideration to the views of the majority. And each juror who finds himself or herself in the majority should give equal consideration to the views of the minority. You are not partisans. You've got no friends to reward. And you've got no enemies to punish. You are judges. You're the judges of the facts of this case. And your sole purpose is to ascertain the truth from the evidence before you. You're the sole and exclusive judges of the credibility of all the witnesses and the weight and effect of all the evidence. And in the performance of this high duty, you are at liberty to disregard all comments of both [c]ourt and counsel, including, of course, the remarks that I'm making to you right now. But remember at all times that no juror is expected to yield the conscientious conviction he or she may have as to the weight

or effect of the evidence. But remember, also, that after full deliberation and consideration of all the evidence, it is your duty to agree upon a verdict if you can do so without violating your individual judgment or your individual conscience. As I previously instructed you, the law presumes a defendant to be innocent. And that presumption of innocence alone is sufficient to acquit a defendant – unless the jury is satisfied beyond a reasonable doubt of the defendant's guilt after a careful and impartial consideration of the evidence introduced at trial. A defendant has no obligation to establish his innocence. The burden is always upon the prosecution to prove beyond a reasonable doubt. And this burden never shifts to the defendant. Now you may take as much time in deliberations as the occasion requires. And you are to take all the time that you feel is necessary.

(Id. at 14:9–16:25). Following the charge, the court offered to the foreperson opportunity for any member of the jury to take a short walk around the courthouse block before resuming deliberations. The jury exited the courtroom at 10:46 a.m. Lunch subsequently was provided to the jury members on premises. Another note followed from the jury at around 1:00 p.m. The parties again were summoned to the courtroom. The note, again signed by the foreperson, appeared indicative of the jury's receptive interpretation of the court's Allen charge. It read:

1. Can we get a flip chart + markers – We don't want to erase the white board + do want to continue outlining and discussed the evidence and its relevance.
2. We will need to end today by/before 5 pm – 2 jurors have medical care giving needs from 5 pm on.
3. If we can't agree today, would it be Monday (holiday?) or Tuesday when we come back?

(DE 65). After consideration with the parties, the court responded affirmatively to the first two questions, and responded to the third one that deliberations would continue if necessary on Tuesday in a signed writing delivered to the jury room.

Just an hour and a half later, at approximately 2:30 p.m., another note was submitted from the jury, signed by the foreperson. This one returned to the theme of the question the foreperson had raised in the presence of the clerk the evening before. It read: "What is the procedure for acquiring

7

an alternate juror if one juror needs to recuse themself?" (DE 66). During the court's brief discussion with the parties it was noted that one member of the jury was pregnant, raising prospect of a possible medical issue. It was agreed more information would be necessary in order to respond. The use of the word "recuse" rather than "excuse" was curious, the court noted.

With consent of the parties, the court invited the jury foreperson to the courtroom to explain the circumstances surrounding any recusal. The foreperson indicated that the jury was deadlocked. The foreperson explained that "one juror [was] getting very emotional," and she did not "see [the jury] coming to a position of agreement." (Tr. Day 4, DE 73, 22:13–21). In describing the emotional juror, the foreperson asked "how frank can I be?". (Id. at 22:14). The court reminded the foreperson not to disclose how the jury stood, but instead guided her to disclose if there was a health issue, to which she responded in the negative. "No," she answered, "[i]t's just that this one juror is not going to change their mind. And the discussions become emotional. And the person – I don't see us coming to a position of agreement." (Id. at 22:18-21). She continued:

> And one thought that some of the other jurors have brought up is there is an alternate. Is it reasonable, is it proper, is it even possible – you know, we, in front of the one person, we asked, you know, is this something that – you know, we know you feel strongly about this, is this something you would consider? Object to? How you feel about it? Because we don't want – you know, its not a hidden thing.
>
> * * *
>
> And so the person said, you know, that it wouldn't be on their conscience at that point and they would, you know, that would be fine. So I don't know if that's a possibility. I don't see us coming to a conclusion amongst the 12 that we have now.

(Id. at 21:22–23-10).

Indicating it would need some time to discuss the matter with the parties, the court then dismissed the foreperson from the courtroom. After the foreperson exited, the court began by saying

8

to the parties that it was not aware of any authority permitting removal of a juror who was in disagreement with others. In response, the government offered argument on the propriety of excusing a juror for refusing to deliberate. Defendant, represented at trial by two members of the Office of the Federal Public Defender, offered argument in support of a motion for mistrial on basis that the jury was deadlocked.

Counsel for the government commented that 11 jurors had accepted the court's invitation to take a walk, as known to her because they walked by her when she was sitting in her car. Defendant repeated its earlier argument in opposition to further inquiry about not piercing the jury veil. All things considered, over defendant's objection, the court invited the foreperson back into the courtroom to answer a limited set of questions to determine whether or not a juror was refusing to deliberate:

| | |
|---|---|
| The Court: | Thank you for your time again. I just have a few more questions. |
| Foreperson: | Yes. |
| The Court: | Has the juror that you've described been participating in discussions in the jury room? |
| Foreperson: | Very much so, |
| The Court: | Okay. Has the juror attempted to encourage others to subscribe to that juror's view of the evidence? |
| Foreperson: | Yes. |
| The Court: | Okay. Has that juror been looking at the evidence as it becomes the subject of further inquiry in the jury room? |
| Foreperson: | Yes. And that juror has made some modifications to some of that juror's ideas, but not to the core problem ideas. |
| The Court: | Okay. And you are firmly convinced that this group of 12 individuals who have been working very hard in the jury room under your oversight is unable to come to a unanimous verdict? |
| Foreperson: | Yes. |
| The Court: | Okay. But it does not sound like an instance where somebody has simply gone into the room and refused to participate in these proceedings" |
| Foreperson: | Not at all. |
| The Court: | Okay. Thank you very much.<br>(Foreperson exits the courtroom.) |

9

(Id. at 27:19-25; 28:1-20)

The court asked the government if it then consented to defendant's motion for mistrial. The government expressed appreciation for the court's agreement to ask these additional questions and consented to the motion. The court responded that it now would call the jury in, thank them for their service, and send them on their way. The following exchange occurred during which both lawyers representing defendant actively participated, together with counsel on behalf of the government:

| | |
|---|---|
| The Court: | Yes. Okay. Well, I will call the jury in. I will thank them for their service and send them on their way. [Defendant] will remain in the custody and be the subject of such other further orders and notices as are appropriate. Is there anything else that we should take up before the jury comes back in? |
| Mr. Ellis: | I don't believe so, Your Honor. |
| The Court: | Okay. From the government? |
| Ms. Wilson: | No, Your Honor. Thank you. |
| The Court: | Okay. All right. All right. Let's bring our alternate down and our jury in. We'll get our alternate down and our jury in. Do you all want to talk to this jury before it leaves? I mean, if anybody is willing to speak with you? |
| Ms. Wilson: | Yes. The government would like to do that. |
| The Court: | Okay. |
| Ms. Shea: | And we would like to as well. |
| The Court: | Okay. |

(Id. at 29:1–29:20).

The other of defendant's counsel, the one who did not argue motion for a mistrial, then requested the court to reconsider the procedural posture of the case just as the jury was set to return to the courtroom:

| | |
|---|---|
| Mr. Ellis: | Would the Court be willing to consider one more Allen charge to this jury? Or you think that would be futile? |
| The Court: | Well, what says the government? I mean, you all made a motion for mistrial. Is there a disagreement between the two of you [Shea and Ellis]? |
| Mr. Ellis: | We're just talking about the best thing to do here. And I think we're |

10

> not real sure to be honest. I know it's been a lot and a lot of resources —
>
> The Court: I'm willing to let them go back in and talk and tell me in a note but — I'll see how it goes.
>
> (The jury enters the courtroom at 2:48 p.m.)

(Id. at 29:22 – 30:8).

Upon this new request by defendant, the court turned its attention to the jury upon its entry into the courtroom:

> Well, ladies and gentlemen of the jury, I understand that you continue to be unable to reach a verdict. And based on the information that has been brought to my attention, I would be inclined to relieve this jury of its obligations to continue to deliberate. But before I do that, I would like the 12 of you to go back in the room and to talk very candidly to one another. And then I would like your foreperson to send me her further note as to whether, in your collective view, this jury is unable to reach a unanimous verdict. There is not an opportunity for, under the reasons that have been presented to me, there's not an opportunity to introduce an alternate juror among you. So the verdict rests solely with you. And if you cannot reach a verdict, you will be mindful of all of my instructions that I've given you. But I would like you to give one further opportunity in the jury room to think about it and communicate with me. I'll stand here ready to receive your note from you foreperson.

(Id. at 30:9 – 31:32).

After the jury left the room at 2:54 p.m., the government made another of its repeated requests to excuse the juror at issue, in this instance on grounds that the juror lied during voir dire:

> This idea that someone doesn't want to have this on their conscience, to me, raises the question of whether, when you asked the voir dire question does someone have a moral or religious view that would keep them from standing in judgment of another, whether that would be a question that this juror answered contrary to the way that he or she believes. Because if that is the case, from, then I think that would possibly be grounds to excuse the juror for lying during voir dire.

(Id. at 31:10-19). Defense counsel disagreed, with reference to the underpinnings of the Allen charge. The court rejected the government's argument to dismiss the holdout juror. No objection was raised

11

by either side concerning the court's final instruction to the jury or the Allen charge preceding it.

At 3:09 p.m., 15 minutes after they were excused, and about 25 minutes after the court finished questioning the foreperson, the jury entered the courtroom to report its guilty verdict. The jury was polled and all 12 members indicated assent to the verdict. Upon the jury's discharge, its members all took leave of the courthouse. None remained for interview by an attorney, the lawyers reported later to the court. Defendant made an oral motion to set aside the verdict.

On February 23, 2017, the court held an administrative telephone conference with the parties. At conference, the court confirmed defendant's intent to file a motion for new trial. The government indicated that it would not consent to such motion. On March 3, 2017, defendant filed the instant motion for new trial. The court convened hearing on the motion May 1, 2017.

## DISCUSSION

Federal Rule of Criminal Procedure 33 allows the court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33 motions may be based on either (1) newly discovered evidence, or (2) "other grounds." Id. Unless grounded on newly discovered evidence, a motion made pursuant to Rule 33 "must be filed within 14 days after the [guilty] verdict." Id. A district court has broad discretion in granting or denying a motion for new trial. See e.g., United States v. Smith, 451 F.3d 209, 216–17 (4th Cir. 2006). Still, [a] court should exercise its discretion to grant a new trial sparingly, and it should do so only when the evidence weighs heavily against the verdict." United States v. Chong Lam, 677 F.3d 190, 203 (4th Cir. 2012). In this instance "other grounds" are relied upon by defendant.

Defendant contends that new trial is warranted for three reasons: 1) the verdict was returned after the court granted a mistrial; 2) the government impermissibly shifted the burden of production;

12

and 3) the court disallowed a "mere presence" instruction. These reasons are discussed in turn below, from least to most consequential.

A. Mere Presence

The court's disallowance of the requested "mere presence" instruction does not warrant a new trial. The Fourth Circuit has repeatedly found that a criminal defendant is not entitled to a "mere presence" instruction where instructions given by the district court adequately addressed the elements of the offense and relevant definitions. See e.g., United States v. Herder, 594 F.3d 352, 361 (4th Cir. 2010) (finding that defendant was not entitled to a "mere proximity" instruction where the instructions given "properly defined possession as actual possession or power and intent to exercise control"); United States v. Robinson, 73 Fed. App'x 662, 664 (4th Cir. 2003).

In Robinson, the defendant was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. (S) 922(g)(1). Officers apprehended the defendant after he fled from police who were responding to a 911 call. At trial, an officer testified that as the defendant fled, he saw the defendant throw a firearm into a sewer, in the same vicinity where a firearm was later recovered. The defendant requested instruction that his mere presence near the firearm was insufficient to establish possession. Affirming the district court, the Fourth Circuit found that because "the instructions given to the jury properly advised the jury that the [g]overnment was required to prove the firearm and ammunition were within [the defendant's] control, and that he possessed them purposefully, voluntarily, and not by accident or mistake[,]" defendant was not entitled to the requested mere presence instruction. Id. Here, like Robinson, the court properly defined possession as actual possession or physical control or intent to exercise control over a thing.

Furthermore, at trial, the government did not try to establish that defendant constructively

13

possessed the gun. Since constructive possession was not an issue in this case, the requested mere presence instruction was not appropriate. See e.g., United States v. Blue, 957 F.2d 106, 107–08 (4th Cir. 1992) (noting that mere proximity of a firearm does not establish the dominion or control required to uphold a finding of constructive possession). Therefore, the court's disallowance of the requested "mere presence" instruction does not justify granting a new trial.

B. Burden Shifting

Defendant's argument that the government impermissibly shifted the burden of production also misses the mark. "Generally in a criminal case the prosecution bears . . . the production burden." Mullaney v. Wilber, 421 U.S. 684, 703 n.31 (1975). Defendant argues that new trial is required because the government impermissibly shifted its burden of production when it stated in its rebuttal: "[W]e have no evidence here of a cell phone. We don't know what color the phone was. We don't know its size. There has been no evidence of what a cell phone here would like." (Tr. Day 3, DE 81 at 135:10–13).[5]

Contrary to defendant's suggestion, this statement did not impermissibly shift the government's burden of production to the defense. After defendant chose to produce evidence of the cell phone, the government properly attacked the quality of that evidence. In any event, the court repeatedly instructed the jury that the government bears the burden of production in this case. (See DE at 6–7) ("The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. . . . Remember as well that the law never imposes upon a defendant in a criminal case the burden . . . of producing any evidence."). Accordingly, a new trial is not warranted on this basis.

---

[5] At hearing held May 1, 2017, the government indicated that the transcript of closing arguments was not yet available to the parties. The transcript for the third day of trial, which includes the parties' closing arguments, was filed on April 5, 2017. (See DE 81).

14

See United States v. Tanouie, 43 Fed. App'x 568, 570 (4th Cir. 2002) (citing United States v. Harrison, 716, F.2d 1050, 1053 (4th Cir. 1893) (finding impermissible burden shifting to be harmless error where the "court gave explicit instructions that the burden of proof is always on the government and never shifts to the defendant").

C. Mistrial

Around four hours after the court issued its Allen charge, the foreperson indicated to the court that the jury remained deadlocked. At that time, defendant made a motion for mistrial. Upon the court's further inquiries the government consented to defendant's motion for mistrial. While the word "allowed" was not uttered by the court, despite the government's view to the contrary, the record makes plain defendant's consented to motion was allowed.

Upon confirming the government's consent to the requested relief, the court stated its immediate plan of action giving every indication the motion then was allowed. It informed the parties that the alternate juror now would be brought into the courtroom, and upon the jury's return, all would be thanked and sent on their way. Defendant would, the court directed, remain in custody. The court also discussed the parties' interest in speaking with any discharged member, if a member of the jury was so willing, to which affirmative responses were made by counsel on both sides.

When the court addressed the jury for the final time, the court instructed the jury in part that "it was inclined to relieve the jury of its obligations to continue to deliberate," (id. at 30:13–14), but, before doing so, it wanted the jurors to discuss further whether or not they could reach unanimous verdict. Since the circumstances did not provide for introduction of an alternate juror, responding to that question then squarely before it, the court further instructed the jury given there was no mechanism for substitution that "the verdict rests solely with [them]," and that if they could not

15

reach a verdict they must be mindful of all the court's prior instructions. (Id. at 30:23–25). While this issue was not raised on motion by defendant, upon its own review the court is satisfied that its direction to the jury to consider whether they would be able to reach a unanimous verdict did not improperly coerce the jury into reaching a verdict. See e.g., Wiggins v. Boyette, 635 F.3d 116, 127 (4th Cir. 2011) (finding an instruction, which "simply explained to the jurors that they should continue to deliberate," to be non-coercive).

Defense counsel's request immediately following the court's allowance of the motion for mistrial, for the court to view that motion as improvidently made and consider some further charge to the jury, amounted to a request for the court to vacate its ruling on motion for mistrial, which the court allowed. In the 15 minutes or so between the time the jury left the courtroom to resume deliberations and when it returned for the final time with verdict, defendant made no objection to the court's direction to the jury. There was opportunity so to do. Court remained in session. During this interval the government made another of its repeated requests to excuse the juror at issue, this time premised on the foreperson's comment about the juror's duties weighing on conscience. Defendant, through counsel, countered in response with reminder of the Allen charge's deference to conscience component.

Much is made by defendant in briefing of defendant's inability to effectively consult then with counsel. At hearing it was offered that defendant did question his attorneys about courtroom events surrounding counsel's request for mistrial and then, after that was allowed, counsel's request to vacate decision on mistrial to permit further jury deliberations. Both counsel and defendant, who requested and was allowed to address the court directly at this hearing, underscored defendant's stated desire then to his attorneys that a mistrial be proclaimed.

16

It is well-established that decisions regarding mistrial do not belong exclusively to criminal defendants, see United States v. Chapman, 593 F.3d 365, 368 (4th Cir. 2010) ("[t]he Supreme Court has never suggested that decisions about mistrials of 'of such a moment' that they can be made only by the defendant himself, and every circuit to consider the question has concluded that decisions regarding mistrials belong to the attorney, not the client."). Under the law, whether defense counsel talked with defendant before moving for mistrial is of no moment nor is whether defense counsel discussed directly with defendant request made to the court to vacate its decision allowing that motion. Significantly, even if defense counsel consulted with defendant about whether to vacate the court's grant of mistrial, defense counsel's decision would control. See id. at 369 ("[I]f consultation and consent by the client are not required with regard to [mistrial] decisions, the client's expressed disagreement with counsel's decision cannot somehow convert the matter into one that must be decided by the client. . . . Likewise, we believe that whether to seek or accept a mistrial is matter left to the sound judgment of counsel, even if the client disagrees with counsel's decision.").

Finally, the court is not persuaded that "it would be a manifest injustice to let the guilty verdict stand." United States v. Chin, 181 F.3d 92, 92 (4th Cir.1999). Evidence presented at this trial does not weigh heavily against the verdict. See Chong Lam, 677 F.3d at 203 (affirming the denial of a Rule 33 motion grounded in prosecutorial misconduct where evidence presented at trial did not "weigh[] heavily against the verdict") (internal citations omitted). Indeed, the government presented substantial evidence of defendant's guilt.

To sustain its burden of proof, the government had to establish three separate elements including 1) that defendant was a convicted felon, and 2) after the conviction defendant knowingly possessed a firearm, 3) which firearm was in or affecting interstate or foreign commerce. The parties

17

stipulated that defendant was a convicted felon. Defendant did not meaningfully challenge that the firearm affected interstate commerce.

The proof necessarily revolved around the element of possession. To establish possession, the government offered testimony from two Raleigh police officers that defendant exited a stolen car holding a gun in his hand. To corroborate this testimony, the government produced video footage from a dash-camera, which depicts defendant stepping out of the stolen car, holding a large L-shaped object. In the video, as defendant steps out of the car, one of the officers is heard yelling the "10-code" for gun. The jury also heard testimony that as defendant fled, he threw an object down in the same vicinity where the firearm was found. One of defendant's shoes was located nearby.[6] Evidence, viewed in the proper light, established that defendant possessed a firearm in violation of 18 U.S.C. § 922(g). For all these reasons, the court cannot conclude that "it would be a manifest injustice to let the guilty verdict stand." Chin, 181 F.3d at 92

## CONCLUSION

For the foregoing reasons the court DENIES defendant's motion for new trial. (DE 74). A date for defendant's sentencing will be noticed by the Clerk of Court.

---

[6] The government also offered evidence regarding the firearm's origins. The firearm in question was stolen from the home of Tralane Jackson, a correctional officer at the Durham County Jail and resident of Durham County. In an interesting turn of events, before the firearm was stolen, defendant was detained at the Durham County Jail and for a period of time during defendant's detention, Jackson supervised defendant's pod. While there is no evidence of record to suggest defendant was involved in the theft of the gun, the gun was stolen from Jackson's Durham residence approximately two weeks after defendant was released from the Durham County jail. The evidence showed that it was in Wake County where the gun was found, near defendant's shoe and in the vicinity where defendant exited a motor vehicle.

18

SO ORDERED, this the 3rd day of May, 2017.

LOUISE W. FLANAGAN
United States District Judge